Domenic A. Cossi, Esq.
Adam M. Shaw, Esq.
**WESTERN JUSTICE ASSOCIATES, PLLC**
Trial Lawyers for People and the Environment
303 W. Mendenhall, Suite 1
Bozeman, Montana 59715
Telephone: (406) 587-1900
Facsimile: (406) 587-1901
Email: domenic@westernjusticelaw.com
Email: adam@westernjusticelaw.com

Joseph P. Guglielmo (*Pro Hac Vice Forthcoming*)
Erin G. Comite (*Pro Hac Vice Forthcoming*)
Andrew Stanko (*Pro Hac Vice Forthcoming*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, New York 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
Email: jguglielmo@scott-scott.com
Email: astanko@scott-scott.com

*Attorneys for Financial Horizons Credit Union and Collegedale Credit Union*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| FINANCIAL HORIZONS CREDIT UNION and COLLEGEDALE CREDIT UNION, individually, and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br>    v.<br><br>TICKETMASTER, LLC; LIVE NATION ENTERTAINMENT, INC., and SNOWFLAKE, INC.,<br><br>               Defendants. | Case No. CV-25-06-BU-BMM<br><br>**CLASS ACTION COMPLAINT**<br><br>**and**<br><br>**DEMAND FOR JURY TRIAL** |

Financial Institution ("FI") Plaintiffs, Financial Horizons Credit Union

("FCFU"), and Collegedale Credit Union ("CCU") (collectively "Plaintiffs"),

individually, and on behalf of the Class (defined below), based on personal

knowledge as to themselves and their own acts, on information and belief where

indicated, and upon investigation of counsel as to all other matters, bring this

putative class action against Defendants Ticketmaster, LLC ("Ticketmaster"), Live

Nation Entertainment, Inc. ("Live Nation" and together Ticketmaster and Live

Nation are "Ticketmaster"), and Snowflake, Inc. ("Snowflake") (collectively with

Ticketmaster, "Defendants"), and allege as follows:

## I.    INTRODUCTION

1.      Plaintiffs bring this class action on behalf of financial institutions that

have suffered, and continue to suffer, financial losses as a direct result of

Defendants' conscious failure to take adequate and reasonable measures to protect

Plaintiffs' customers' personal and financial data.

2.      Defendants' actions exposed highly sensitive data, such as cardholder

name, address, email address, phone number, primacy account numbers for credit

and debit card numbers, and other data ("Payment Card Data" or "PCD"), to threat

actors for an extended period.  This prolonged exposure compromised the privacy

and financial security of hundreds of thousands, if not millions, of Plaintiffs' and

Class Member's customers exposed and accessible for use by hackers for months.

As a result, Plaintiffs and Class Members have incurred significant damages in replacing customers' payment cards and covering fraudulent purchases, among other things.

3.      Ticketmaster is one of the largest ticket sales and distribution companies in the world.  In 2009, Ticketmaster, LLC, merged with event promoter and venue operator Live Nation to form Live Nation Entertainment, Inc.  Together, Defendants operate as a leading force in the live entertainment industry, promoting, managing, and overseeing entertainment venues and ticket sales for live events.  As part of its business operations, Ticketmaster uses Snowflake's data cloud services to store PCD.

4.      Snowflake is a cloud computing-based data cloud company that provides cloud-based data storage and analytics services, generally termed "data-as-a-service" to numerous corporate companies including Ticketmaster, Adobe, AT&T, Kraft Heinz, Mastercard, HP, Nielsen, Novartis, PepsiCo, Siemens, and NBC Universal.  Snowflake bills its services as "[a] single, fully managed platform that powers the AI Data Cloud. Snowflake securely connects businesses globally across any type or scale of data to productize AI, applications and more in the enterprise."[1]

---

[1] *Why Snowflake AI Data Cloud*, SNOWFLAKE, https://www.snowflake.com/en/why-snowflake/ (last visited Jan. 09, 2025).

5.    Ticketmaster operates a digital ticketing platform that requires customers to provide their PCD in order to make a purchase.  To make a purchase from Ticketmaster, customers are required to entrust Ticketmaster with their PCD. This information is ultimately stored in Ticketmaster's Snowflake account.  In return, Plaintiff and the Class reasonably expect that Defendants will safeguard that PCD.

6.    As a large entertainment company which engages in the sale and distribution of event tickets, Ticketmaster knowingly collects and stores PCD and has a resulting duty to secure this information from unauthorized access and exfiltration.  Ticketmaster expressly recognize this duty to safeguard customer Personally Identifiable Information ("PII"), publicly stating: "We have security measures in place to protect your information."[2]

7.    Similarly, Snowflake recognizes the responsibility of protecting the sensitive information with which it is entrusted, stating that "[s]ecurity has been foundational to the Snowflake platform since the very beginning" and further

---

[2] *Live Nation Entertainment Privacy Policy*, LIVE NATION ENT. (Dec. 1, 2022), https://help.livenation.com/hc/en-us/articles/10464047306641-Live-Nation-Entertainment-Privacy-Policy.

representing that "[s]ince our founding in 2012, security of our customers' data has been our highest priority."[3]

8.    Despite their duties to safeguard customer PCD, however, on or about May 31, 2024, Ticketmaster disclosed that certain customer data, including PCD, had been stolen from Ticketmaster's third-party cloud database provider by threat actors (the "Data Breach").[4]  On May 31, 2024, Ticketmaster's parent, Live Nation, disclosed in its Form 8-K filing with the U.S. Securities and Exchange Commission ("SEC") that it had identified "unauthorized activity within a third-party cloud database environment containing Company data (primarily from its Ticketmaster subsidiary)" and that Live Nation further stated that it had "launched an investigation with industry-leading forensic investigators to understand what happened."[5] and noted that "[o]n May 27, 2024, a criminal threat actor offered what it alleged to be Company user data for sale via the dark web."[6]

---

[3] Brad Jones, *Snowflake Security Hub*, SNOWFLAKE, https://www.snowflake.com/en/resources/learn/snowflake-security-hub/ (last visited Aug. 2, 2024).

[4] Lawrence Abrams, Ticketmaster Confirms Massive Breach After Stolen Data for Sale Online, BLEEPING COMPUTER. (May 31, 2024), https://www.bleepingcomputer.com/news/security/ticketmaster-confirms-massive-breach-after-stolen-data-for-sale-online/.

[5] Live Nation Ent., Inc., Current Report (Form 8-K) (May 20, 2024).

[6] *Id.*

9.    Although Ticketmaster did not identify the third-party cloud database in the public statement it issued, "a spokesperson for Ticketmaster, who would not provide their name but responded from the company's media email address, told TechCrunch that its stolen database was hosted on Snowflake, a cloud storage and analytics company."[7]

10.    Ticketmaster did not disclose how the data was exfiltrated, and Snowflake stated in a post that it had informed a limited number of customers it believed might have been impacted by attacks targeting their accounts.  A *Wired.com* article, however, reported communication with one of the hackers, who confirmed that Ticketmaster was one of the entities whose data was stolen from Snowflake accounts.  The article further noted that Ticketmaster's parent, Live Nation, had acknowledged in May that data had been stolen from its Snowflake account, although it did not disclose how the hackers accessed the Snowflake account.[8]

---

[7] Zach Whittaker, *Live Nation confirms Ticketmaster was hacked, says personal information stolen in data breach*, TECHCRUNCH (May 31, 2024), https://techcrunch.com/2024/05/31/live-nation-confirms-ticketmaster-was-hacked-says-personal-information-stolen-in-data-breach/.

[8] Kim Zetter, *Hackers Detail How the Allegedly Stole Ticketmaster Data From Snowflake*, WIRED (June 17, 2024),https://www.wired.com/story/epam-snowflake-ticketmaster-breach-shinyhunters/.

11.    Data stolen from Ticketmaster was reportedly being sold on the dark web.  Specifically, the administrator of a cybercrime forum called BreachForums claimed to be selling the personal information of 560 million customers, including Ticketmaster customers' data, ticket sales information, and PCD.[9]

12.    Security researchers have attributed the Data Breach to the cybercriminal gang, UNC5537, and to date have notified approximately 165 Snowflake customers that their data may have been stolen during the Data Breach.[10]

13.    A "critical factor" leading to the Data Breach was Defendants' data security policy, or lack thereof, on multifactor authentication ("MFA").  At the time of the Data Breach, Snowflake did not at automatically enroll its customers in or require them to set up MFA to access their Snowflake accounts, and Ticketmaster did not implement MFA to access its Snowflake account.[11]  On July 9, 2024, over two and a half months following discovery of the Data Breach,

---

[9] Whittaker, *supra* note 7.

[10] Zack Whittaker, *Mandiant says hackers stole a 'significant volume of data' from Snowflake customers*, TECHCRUNCH (June 10, 2024), https://techcrunch.com/2024/06/10/mandiant-hackers-snowflake-stole-significant-volume-data-customers/

[11] *Id.*

Snowflake announced that it has given administrators of its accounts the capability to require MFA for all account users.[12]

14.    On or about December 17, 2024, Visa, a payment card services corporation, issued a series of alerts to financial institutions, including Plaintiffs, notifying them that a potential network intrusion at Ticketmaster had put payment account information at risk. Visa further indicated that PCD, specifically payment account numbers, had been potentially compromised.  Visa further estimated that the "exposure window" for the Ticketmaster included PCD from May 18, 2009, through May 18, 2019.

15.    As a direct and proximate result of Defendants' failure to implement and follow basic security procedures, Plaintiffs and the Class (defined below) have been injured because Plaintiffs' PCD is now in the hands of cybercriminals and available for sale on the dark web.

16.    Plaintiffs bring this class action to remedy the financial losses they suffered and continue to suffer, to address the imminent risk of future harm, including fraudulent banking activity, which is likely to result from Defendants' failure to secure Plaintiffs' and the Class' PCD.

---

[12] Brad Jones and Anoosh Saboori, *Snowflake Admins Can Now Enforce Mandatory MFA*, Blog, RESOURCES (July 9, 2024).

17.    This Data Breach shocks the conscience.  Defendants fully understood their duties to protect the confidentiality, accuracy, and integrity of PCD. Defendants fully understood that the threat of a data breach was a legitimate risk, and that if one occurred, the consequences would be severe.  Yet, Defendants failed to take the necessary steps to adequately protect PCD.

18.    Indeed, Ticketmaster was subject to a prior data breach in 2018 in which PII and PCD were compromised.  Specifically, a report was issued by the Information Commissioner of the United Kingdom in November 2020 regarding a data breach which occurred in June 2018.[13]  Specifically, malicious code was identified on Ticketmaster's website which allowed hackers to take over a chat bot that included on its payment page.[14]  The Report further stated that "Because Ticketmaster included the chat bot on its payment page, the personal data scraped by the malicious code included financial data such as names, payment card numbers, expiry dated and CVV number."[15]

19.    The Data Breach was a direct consequence of Defendants' deliberate decisions not to adopt recommended data security measures.  These decisions that

---

[13] Information Commissioner's Office, Penalty Notice, Case ref: COM0759008 (Nov. 13, 2020), https://ico.org.uk/media/action-weve-taken/2618609/ticketmaster-uk-limited-mpn.pdf (the "Report").

[14] *Id.*

[15] *Id.*

left PCD vulnerable, ultimately exposing Plaintiffs' and the Class' PCD to cybercriminals. Had Defendants adopted reasonable data security measures, the Data Breach could have been prevented.

20.    Plaintiffs and the Class have borne, and will continue to bear, the costs associated with Defendants' negligent management of PCD data. When PCD compromised in the Data Breach is misused, it is Plaintiffs and the Class that bear the brunt of the injuries as they must reimburse consumers for the fraud losses and pay other costs associated with reissuing compromised payment cards.

21.    Plaintiffs and the Class also have incurred, and will continue to incur, direct out-of-pocket costs related to investigating and addressing the impact of the Data Breach, including increased monitoring for potentially fraudulent payment card transactions, fraudulent banking activity, and communicating with customers regarding their concerns about the Data Breach and the safety of their financial accounts in light of the Data Breach.

22.    Finally, a certainly impending risk of future harm, in the form of future fraudulent payment card and fraudulent banking activity, exists as a direct result of the Data Breach. This risk of harm will continue into the foreseeable future and will require Plaintiffs and the Class to incur significant costs and expenses in order to reduce and mitigate this risk of harm.

23.    Plaintiffs, individually, and on behalf of a nationwide class, seek monetary and non-monetary relief and assert claims against Defendants for negligence (including negligence *per se*), unjust enrichment, and declaratory judgment.  Finally, Plaintiffs, individually, and on behalf of a nationwide class, also request a declaratory judgment.

## II.    PARTIES

### A.    Plaintiffs

24.    Plaintiff Financial Horizons Credit Union is a state-chartered credit union with a principal place of business in Hawthorne, Nevada.  As a result of the Data Breach, Plaintiff Financial Horizons Credit Union has suffered, and continues to suffer, injury, including, among other things, costs to cancel and reissue payment cards compromised in the Data Breach, costs to refund fraudulent charges, costs associated with the time and expense associated with investigating the Data Breach, costs of fraud monitoring, and costs due to lost interest and transaction fees due to reduced payment card usage.

25.    Plaintiff Collegedale Credit Union is a state-chartered credit union with a principal place of business in Collegedale, Tennessee.  As a result of the Data Breach, Plaintiff Collegedale Credit Union has suffered, and continues to suffer, injury, including, among other things, costs to cancel and reissue payment cards compromised in the Data Breach, costs to refund fraudulent charges, costs

associated with the time and expense associated with investigating the Data

Breach, costs of fraud monitoring, and costs due to lost interest and transaction

fees due to reduced payment card usage.

### B.    Defendants

26.    Defendant Live Nation is a Delaware corporation with a principal

place of business located at 9348 Civic Center Drive, Beverly Hills, CA 90210.

27.    Defendant Ticketmaster is a Virginia limited liability company with a

principal place of business located at 9348 Civic Center Drive, Beverly Hills, CA

90210.  Upon information and belief, Ticketmaster is a single member limited

liability company, with its sole member being Live Nation Worldwide, Inc., a

Delaware corporation with a principal place of business located at 9348 Civic

Center Drive, Beverly Hills, CA 90210.  Ticketmaster is a citizen of each State in

which its member is a citizen.  Ticketmaster is therefore a citizen of the States of

Delaware and California.

28.    Throughout the events at issue here, Defendants Live Nation and

Ticketmaster have operated as one entity.  Live Nation has used Ticketmaster as a

dependent and integrated division rather than as a separate legal entity.  Live

Nation describes Ticketmaster as one of the company's three "divisions" along

with Concerts and Sponsorship.  The business operations are fully coordinated and

shared.  Resources are cross-applied without recognizing full and complete cost

and profit centers.  Live Nation and Ticketmaster share a corporate headquarters.

Ticketmaster's top executives, including its President, Chief Operating Officer,

and Chief Technology Officer are listed as executives of Live Nation.

Management decisions at Ticketmaster are made by and through management of

Live Nation.  The management of Live Nation and Ticketmaster were and are

directly involved in the events at issue in this litigation, including cybersecurity,

the Data Breach itself, and Defendants' response to the Data Breach.

29.    Recognition of the technical corporate formalities in this case would

cause irremediable injustice and permit Live Nation – the entity whose

management caused and permitted the events alleged herein – to defeat justice and

to evade responsibility.

30.    Accordingly, for all purposes herein, when Plaintiffs allege

"Ticketmaster" as the actor or responsible party, they are alleging the participation

and responsibility of Live Nation and Ticketmaster collectively.

31.    Defendant Snowflake is a Delaware corporation with its principal

place of business and headquarters located at 106 E. Babcock Street, Suite 3A,

Bozeman, MT 59715.

## III.    JURISDICTION AND VENUE

32.    This Court has original jurisdiction over this action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. §1332(d).  The aggregated claims of

the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members; and minimal diversity exists because at least one member of the putative class is a citizen of a different state than Defendants.

33.    This Court has personal jurisdiction over Snowflake because Snowflake maintains its principal headquarters in this District, Snowflake's executives are located in Montana, and Snowflake is registered to conduct business in Montana.

34.    This court has personal jurisdiction over Ticketmaster because Ticketmaster is registered to conduct business in Montana, Ticketmaster has conducted business in Montana, including through its acquisition of a majority stake in Logjam Presents, the leading promoter and operator venue in Montana, and Ticketmaster regularly conduct business in Montana.  Ticketmaster has sufficient minimum contacts in Montana and intentionally avail themselves of this jurisdiction by conducting their corporate operations here and promoting, selling, and marketing products and services to Montana financial institutions, consumers, and other entities.

35.    Venue is proper in this District under 28 U.S.C. §1391(a) because Defendant Snowflake's principal places of business is in Montana, and a

substantial part of the events, acts, and omissions giving rise to the claims of

Plaintiffs occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Background on Electronic Debit and Credit Card Transactions and Requirements for Securing Data

36.    Plaintiffs and the members of the Class are financial institutions that

issue payment cards to their customers.[16]

37.    Ticketmaster accepts customer payment cards for the purchase of

goods and services.  The payment card information is entered onto Ticketmaster's

website or the payment card is inserted, tapped, or swiped on a point of sale

("POS") terminal at a venue to finish the transaction on behalf of a customer.

38.    It is well known that customer PCD is valuable and often targeted by

hackers.  Over the last several years, numerous PCD data breaches have occurred

at companies such as Neiman Marcus, Michaels, Sally Beauty Supply, P.F.

Chang's China Bistro, Eddie Bauer, Goodwill, SuperValu Grocery, UPS, Home

Depot, Jimmy John's, Dairy Queen Restaurants, Staples, Kmart, Noodles & Co.,

GameStop, Wendy's, Chipotle, and Arby's.  These breaches have resulted in

hundreds of millions of compromised PCD, putting Defendants on notice that

Snowflake's cloud storage platforms would be targeted by cyber criminals.

---

[16] These cards include, for example, debit or credit cards branded with the Visa or MasterCard logo.

39.    Indeed, Defendants should have been especially aware of the threat posed by data breaches.  Despite widespread publicity about other data breaches and industry alerts regarding these other notable data breaches, Defendants failed to take reasonable steps to adequately protect its computer systems from being breached.

40.    Ticketmaster's sales are made to customers using credit or debit cards. A basic description of the various steps necessary to execute a credit/debit card transaction is as follows: (1) after the credit/debit card is inserted, tapped, or swiped or the credit/debit card data is entered onto Ticketmaster's website, Ticketmaster uses one of several payment processing networks (*e.g.*, Visa or MasterCard) to transmit a request for authorization to the financial institution that issued the payment card (*e.g.*, Plaintiffs); (2) the issuing institution authorizes the payment and Ticketmaster electronically forwards a receipt of the transaction to another financial institution, known as the "acquiring bank," which contracts with the merchant to process credit and debit card transactions on the merchant's behalf; (3) the acquiring bank forwards the funds to the merchant to satisfy the transaction and is then reimbursed by the issuing financial institution (*e.g.*, Plaintiffs); and (4) finally, the issuing institution posts the debit or credit transaction to its customer's account.

41. Defendants are, and at all relevant times have been, aware that the PCD they maintain is highly sensitive and could be used for nefarious purposes by third parties, such as perpetrating identity theft and making fraudulent purchases.

42. Defendants are, and at all relevant times have been, aware of the importance of safeguarding its customers' PCD and of the foreseeable consequences that would occur if its data security systems were breached, specifically including the significant costs that would be imposed on issuers, such as the Plaintiffs, members of the Class, and others.

43. Given the extensive network of financial institutions involved in these transactions and the sheer volume of daily transactions using credit and debit cards, it is unsurprising that financial institutions and credit card processing companies have issued rules and standards governing the basic measures that merchants must take to ensure consumers' valuable data is protected.

44. The Payment Card Industry Data Security Standards ("PCI DSS") is a list of 12 information security requirements that were promulgated by the Payment Card Industry Security Standards Council.  The PCI DSS list applies to all organizations and environments where cardholder data is stored, processed, or transmitted and requires merchants like Ticketmaster to protect cardholder data, ensure the maintenance of vulnerability management programs, implement strong

access control measures, regularly monitor and test networks, and ensure the maintenance of information security policies.

45.    The 12 requirements of the PCI DSS are:

**Build and Maintain a Secure Network**

    1)    Install and maintain Network Security Controls

    2)    Apply Secure Configurations to All Systems

**Protect Account Data**

    3)    Protect Stored Account Data

    4)    Protect Cardholder Data with Strong Cryptology During Transmission Over Open, Public Networks

**Maintain a Vulnerability Management Program**

    5)    Protect All Systems and Networks from Malicious Software

    6)    Develop and Maintain Secure Systems and Software

**Implement Strong Access Control Measures**

    7)    Restrict Access to System Components and Cardholder Data by Business Need to Know

    8)    Identify Users and Authenticate Access to System Components

    9)    Restrict Physical Access to Cardholder Data

**Regularly Monitor and Test Networks**

    10)    Log and Monitor All Access to System Components and Cardholder Data

    11)    Test Security of Systems and Networks Regularly

**Maintain an Information Security Policy**

> 12) Support Information Security with Organizational Policies
> and Programs.[17]

46.     Ticketmaster's obligations under the Payment Card Industry Data
Security Standard (PCI DSS) v4.0.1 include the implementation of robust security
measures to safeguard sensitive PCD.  PCI DSS establishes a comprehensive
framework that mandates adherence to 12 high-level requirements, several of
which are particularly relevant to the deficiencies alleged in this case.

47.     Encryption of Cardholder Data: PCI DSS v4.0.1 requires entities to
protect stored cardholder data by encrypting it using strong cryptographic methods.
*See* PCI DSS v4.0.1 Requirement 3.  The standard further mandates that encryption
keys be managed securely to prevent unauthorized decryption.  *Id.*  Ticketmaster's
failure to ensure that sensitive PCD was properly encrypted at all stages of
processing constitutes a direct violation of this requirement.

48.     Moreover, Requirement 3.2, "Storage of account data is kept to a
minimum" requires "[a]ccount data storage is kept to a minimum through
implementation of data retention and disposal policies, procedures, and processes
that include at least the following: [. . .] Limiting data storage amount and retention

---

[17] *PCI DSS Quick Reference Guide: Understanding the Payment Card Industry
Data Security Standard version 4.0.1*, PCI SEC. STANDARDS COUNCIL (June 2024),
https://docs-prv.pcisecuritystandards.org/PCI%20DSS/Standard/PCI-DSS-
v4_0_1.pdf.

time to that which is required for legal or regulatory, and/or business requirements. Specific retention requirements for stored account data that defines length of retention period and includes a documented business justification. . . .  A process for verifying, at least once every three months, that stored account data exceeding the defined retention period has been securely deleted or rendered unrecoverable."

49.    <u>Access Controls:</u> Access to cardholder data must be strictly limited to individuals whose job responsibilities necessitate such access, and multi-factor authentication (MFA) must be implemented for all administrative access.  *Id.* at Requirement 8.  Failure to establish and enforce robust access control measures significantly increases the risk of unauthorized access to sensitive data.  The allegations in this case suggest that Ticketmaster failed to adequately restrict access to systems handling cardholder data, thereby enabling unauthorized parties to exploit vulnerabilities.

50.    <u>Logging and Monitoring Requirements:</u> Under PCI DSS v4.0.1, entities are required to log and monitor all access to system components that process or store cardholder data.  *Id.* at Requirement 10.  Regular log reviews are critical to identifying and mitigating potential threats in a timely manner. Ticketmaster's failure to detect unauthorized access to its systems, as alleged in the complaint, underscores a lack of compliance with these monitoring requirements.

51.    <u>Third-Party Documentation and Compliance Validation:</u> The PCI DSS mandates that merchants validate and document the compliance of third-party service providers ("TPSPs") with applicable requirements. *Id.* at Requirement 12.8. This includes conducting due diligence to ensure that TPSPs adhere to encryption, access control, and logging standards. As alleged, Ticketmaster's failure to oversee the compliance of its third-party processor, Snowflake, constitutes a breach of this obligation and reflects a broader pattern of non-compliance with PCI DSS standards.

52.    The Data Breach exposed Ticketmaster's improper collection and maintenance of PCD going as far back as 2009, which clearly violated PCD DSS.

53.    In sum, Ticketmaster's failure to comply with PCI DSS requirements not only facilitated the unauthorized access to PCD but also violated well-established industry standards designed to prevent such breaches.

**B.    Ticketmaster Uses Snowflake's Data Cloud Platform to Store PCD.**

54.    Upon information and belief, Ticketmaster uses Snowflake's data cloud services to conduct its business operations and ultimately store PCD obtain via customer transactions.

55.    Snowflake is a cloud computing-based data company. Snowflake's cloud computing platform allows its customers to store, process, and analyze data in a single place.

56.    Snowflake is one of the largest data cloud platform providers on the market, claiming "thousands of organizations around the world" as its customers. Since its incorporation, Snowflake has acquired more than a dozen companies to bolster its service offerings and has opened over 45 corporate offices around the globe.[18]

57.    During the regular course of providing its data cloud platform to its customers, including PCD, Snowflake is provided and entrusted with certain information, including PCD.  As Snowflake itself has stated, "Snowflake manages all aspects of how this data is stored—the organization, file size, structure, compression, metadata, statistics, and other aspects of data storage are handled by Snowflake."[19]

58.    As a major provider of cloud computing services, Snowflake advertises that it "sets the standard for data security" and further represents that its cloud computing platform "follows world-class, standards-based practices for the controls and processes that secure it and is based on a multilayered security architecture to protect customer data and access to that data."  Snowflake also

---

[18] *Fast Facts*, SNOWFLAKE (Oct. 31, 2024), https://www.snowflake.com/wp-content/uploads/2021/05/SnowflakeFastFactsSheet.pdf.

[19] *Key Concepts & Architecture*, SNOWFLAKE, https://docs.snowflake.com/en/user-guide/intro-key-concepts (last visited Jan. 09, 2025).

states that its "security architecture is completed by the monitoring, alerts, controls, and processes that are part of Snowflake's comprehensive security framework."[20]

59.     Snowflake also recognizes the importance of maintaining adequate data security for its cloud computing platform users: "In today's connected world where cybercriminals have greater opportunity than ever before, data security is crucial for every business."  Snowflake goes on to recommend a list of data security solutions that companies can implement; a list that includes Identity and Access Management ("IAM") strategies.[21]

60.     IAM systems apply individualized access controls through, *inter alia*, authentication such as MFA.[22]  MFA is an electronic authentication method "that requires more than one distinct authentication factor" for a user to be granted access to a website or application.[23]  Examples of MFA include the combination of both an account password and a single-use password sent via text message to a user's mobile phone in order to access an account.

---

[20] *Intro to Data Security*, SNOWFLAKE, https://www.snowflake.com/trending/intro-to-data-security/ (last visited Jan. 09, 2025).

[21] *Id*.

[22] Matthew Kosinski and Amber Forrest, *What is IAM?*, IBM (Jan. 22, 2024), https://www.ibm.com/topics/identity-access-management.

[23] *Id*.

61.    MFA has become an "increasingly important" piece of IAM strategies as standard one-factor authentication, which relies on only usernames and passwords, is easy to break.  Indeed, compromised login credentials are a leading cause of data breaches, and MFA adds an extra layer of protection.  So "[e]ven if hackers steal a password, it won't be enough to gain unauthorized access to a system."[24]

62.    Even though Snowflake supports MFA to provide increased security for its customers accessing the Snowflake platform and recommends that its customers implement MFA, Snowflake did not require its customers, including Ticketmaster, to use MFA or automatically enroll its customers, including Ticketmaster, into MFA prior to the Data Breach.[25]  Nor did Ticketmaster enroll in Snowflake's MFA in order to access its Snowflake account.

### C.    Third-Party Oversight and the Role of Snowflake

63.    Ticketmaster's responsibilities under applicable data security standards included overseeing the compliance and security practices of TPSPs that handled sensitive customer data.  Snowflake's role as a third-party processor imposed an additional obligation on Ticketmaster to ensure that Snowflake

---

[24] *Id.*

[25] *Multi-factor authentication (MFA)*, SNOWFLAKE, https://docs.snowflake.com/user-guide/security-mfa (last visited Jan. 09, 2025).

adhered to the Payment Card Industry Data Security Standard (PCI DSS)

requirements and other data protection mandates.

64.    For example, Requirement 3.4.2 states "[w]hen using remote-access

technologies, technical controls prevent copy and/or relocation of PAN for all

personnel, except for those with documented, explicit authorization and a

legitimate, defined business need."  Although only a best practice until March 31,

2025, when it becomes a formal requirement, remote-access technologies that store

Primary Account Numbers ("PAN") on a storage device such as cloud storage

brings these devices into scope for PCI DSS.

65.    Additionally, Requirement 3.6.1.1 provides that documentation and

testing for service providers who maintain PCD.  Specifically, this Requirement

states "[i]n cloud HSM implementations, responsibility for the cryptographic

architecture according to this Requirement will be shared between the cloud

provider and the cloud customer."

66.    The Payment Card Industry Data Security Standard v4.0.1 (PCI DSS)

explicitly requires entities to document the responsibilities of TPSPs and ensure

their compliance with PCI DSS standards.  *See* Payment Card Industry Data

Security Standard v4.0.1, Requirement 12.8.  Specifically, PCI DSS mandates that

merchants, such as Ticketmaster, maintain written agreements with TPSPs that

include an acknowledgment of the TPSP's responsibility for securing cardholder

data. *Id*. Furthermore, Ticketmaster was obligated to validate Snowflake's compliance through periodic reviews and monitoring of Snowflake's systems. *See id*., Requirements 3.4.2, 3.6.1.1, 12.8.4, 12.8.5.

67.     Snowflake recognizes the importance of industry regulatory standards to its customers, such as Ticketmaster.  Snowflake represents that it helps "organizations streamline security compliance, providing the tools and support required to meet regulatory compliance standards."[26]  Snowflake also represents it is "Level 1 Service Provider compliant under PCI DSS" and further represents that its compliance allows customers, such as Ticketmaster" to store, process or transmit cardholder data utilizing Snowflake Service."[27]

### D.    The Data Breach

68.     In approximately April 2024, a cybercriminal group known as "Shiny Hunters" launched a series of attacks into Snowflake's network and were able to access, obtain, and exfiltrate hundreds of millions of records, including PII and PCD.

---

[26] *Data Security Compliance: Protecting Sensitive Data*, SNOWFLAKE, https://www.snowflake.com/trending/data-security-compliance/ (last visited Jan. 09, 2025).

[27] *PCI DSS*, SNOWFLAKE, https://docs.snowflake.com/en/user-guide/cert-pci-dss (last visited Jan. 09, 2025).

69.     On or about May 30, 2024, news outlets began reporting that a cybercriminal group was selling what was alleged to be the personal and financial information of 560 million Ticketmaster customers.[28]  The cybercriminal demanded $500,000 for the sale of the stolen customer information.[29]

70.     The cybercriminal put the alleged stolen databases for sale on a hacking forum and represented that the databases contained 1.3 terabytes of customer PII, including names, email addresses, as well as PCD.  The information appeared to relate to financial transactions spanning from approximately 2012 to 2024.[30]

71.     The next day, on May 31, 2024, Ticketmaster confirmed that it had suffered the Data Breach, indicating that the stolen data offered for sale on the dark web was customer PII stolen from a third-party cloud database provider. Defendants further confirmed that they had identified unauthorized access in that cloud database on or about May 20, 2024.[31]

---

[28] Sergiu Gatlan, *Data of 560 Million Ticketmaster Customers for Sale After Alleged Breach*, BLEEPING COMPUT. (May 30, 2024), https://www.bleepingcomputer.com/news/security/data-of-560-millionticketmaster-customers-for-sale-after-alleged-breach/.

[29] *Id.*

[30] *Id.*

[31] Abrams, *supra* note 4.

72.     When Ticketmaster discovered the Data Breach, it launched an investigation with industry-leading forensic experts to understand the extent and nature of the breach.  On May 20, 2024, Ticketmaster identified unauthorized activity within Snowflake, a third-party cloud database.[32]  As of May 27, 2024, the stolen data was being offered for sale on the dark web.

73.     Ticketmaster likewise disclosed the database that was compromised contained limited personal information of some customers who bought tickets to events in North America (U.S., Canada, and/or Mexico) and that included emails, phone numbers, encrypted credit card information, and other personal information.[33]

74.     Snowflake conducted its own investigation into the Data Breach.  It engaged prominent cybersecurity firms CrowdStrike and Mandiant to conduct investigations into the Data Breach.  The investigation revealed that the attackers had used spear phishing to deliver information-stealing malware to acquire credentials from a third-party working for Snowflake customers rather than a Snowflake employee, as many had reported.  These credentials allowed the hackers

---

[32] MJ Kaufmann, *Navigating the Aftermath of the Ticketmaster Breach*, VOTIRO (June 20, 2024), https://votiro.com/blog/navigating-the-aftermath-of-the-ticketmaster-breach/.

[33] *Ticketmaster Data Security Incident*, TICKETMASTER, https://help.ticketmaster.com/hc/en-us/articles/26110487861137-Ticketmaster-Data-Security-Incident (last visited Jan. 08, 2025).

to bypass Okta-based security systems, granting them access to customer data. Snowflake promptly provided indicators of compromise and security recommendations to the affected clients.

75.    The information stolen during the Data Breach included databases containing 1.3 terabytes of data, including the PII of approximately 560 million Ticketmaster customers as well as corresponding PCD.  The cybercriminals who claimed responsibility for the Data Breach then proceeded to advertise the stolen data for sale on their dark web leak site for $500,000.[34]

76.    On or about June 28, 2024, Ticketmaster began notifying impacted individuals of the Data Breach, indicating that the threat actor had gained unauthorized access to the cloud database between April 2, 2024, and May 18, 2024.[35]

77.    Since Ticketmaster's confirmation of the Data Breach, the threat actors have increased their extortion attempts, leaking what they claim to have been Ticketmaster barcode data for 166,000 tickets from the extremely popular Taylor Swift Eras Tour.  The threat actors further demanded $2 million or else they

---

[34] Gatlan, *supra* note 29.

[35] Ticketmaster LLC, *Submitted Breach Notification Sample*, CAL. DEPT. OF JUST., https://oag.ca.gov/system/files/%5BT01%5D%20US-General.pdf (last visited Jan. 08, 2025).

would leak 30 million additional event barcodes, including barcodes to Taylor Swift, P!nk, Sting, and sporting events.[36]

78.    Later, threat actors leaked nearly 39,000 Ticketmaster print-at-home tickets for 154 upcoming concerts and events, including Pearl Jam, Phish, Tate McCrae, and Foo Fighters.[37]

79.    Security researchers reported that the Data Breach is the result of threat actors gaining access to Defendants' third-party cloud databases via compromised login credentials.  It appears the login credentials were stolen via historical infostealer malware infections.[38]

80.    Security researchers also reported that access to the cloud storage databases is the result of "poor security practices on impacted accounts, which did

---

[36] Lawrence Abrams, *Hackers Leak Alleged Taylor Swift Tickets, Amp Up Ticketmaster Extortion*, BLEEPING COMPUT. (July 5, 2024), https://www.bleepingcomputer.com/news/security/hackers-leak-alleged-taylor-swift-tickets-amp-up-ticketmaster-extortion/.

[37] Lawrence Abrams, *Hackers Leak 39,000 Print-at-Home Ticketmaster Tickets for 154 Events*, BLEEPING COMPUT. (July 8, 2024), https://www.bleepingcomputer.com/news/security/hackers-leak-39-000-print-at-home-ticketmaster-tickets-for-154-events/.

[38] Jess Weatherbed, *Ticketmaster's Snowflake Data Breach Was Just One of 165*, THE VERGE (June 11, 2024), https://www.theverge.com/2024/6/11/24176080/snowflake-cloud-storage-data-breach-ticketmaster-santander.

not update stolen login credentials or utilize multi-factor authentication (MFA) or network allow lists."[39]

81.    The Data Breach occurred as a direct and proximate result of Defendants' failure to implement and follow basic security procedures to protect customers' PII and PCD, including regularly updating login credentials for their third-party cloud storage databases and/or enabling MFA for access to those cloud storage databases.

**E.    Defendants Knew that a Breach of Ticketmaster's Snowflake Was a Foreseeable Risk**

82.    With data breaches and identity theft on the rise, Defendants knew that a breach of Snowflake's computer systems was a foreseeable risk.  Defendants also knew what the repercussions of such a breach would be.

83.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at third-party service providers, including Progress Software Corporation, Fortra, Accellion, and Cleo.

84.    As discussed in its Fiscal Year 2023 Form 10-K, which was issued on February 22, 2024, Ticketmaster devoted an entire section of risk disclosure to data security, stating, among other things, that:

---

[39] *Id.*

***Data loss or other breaches of our network security could materially harm our business and results of operations, and the processing, storage, use and disclosure of personal or sensitive information could give rise to liabilities and additional costs as a result of governmental regulation, litigation and conflicting legal requirements relating to personal privacy rights.***

Due to the nature of our business, we process, store, use, transfer and disclose certain personal or sensitive information about our customers and employees. Penetration of our network or other misappropriation or misuse of personal or sensitive information and data, including credit card information and other personally identifiable information, could cause interruptions in our operations and subject us to increased costs, litigation, inquiries and actions from governmental authorities, and financial or other liabilities. In addition, security breaches, incidents or the inability to protect information could lead to increased incidents of ticketing fraud and counterfeit tickets. Security breaches and incidents could also significantly damage our reputation with consumers, ticketing clients and other third parties, and could result in significant costs related to remediation efforts, such as credit or identity theft monitoring.

Although we have developed systems and processes that are designed to protect customer and employee information and to prevent security breaches or incidents (which could result in data loss or other harm or loss), such measures cannot provide absolute security or certainty. It is possible that advances in computer and hacker capabilities, new variants of malware, the development of new penetration methods and tools, inadvertent violations of company policies or procedures or other developments could result in a compromise of customer or employee information or a breach of the technology and security processes that are used to protect customer and employee information. The techniques used to obtain unauthorized access, automate or expedite transactions or other activities on our platform, disable or degrade service or sabotage systems (or otherwise bring about one or more of these effects) may change frequently and as a result, may be difficult for our business to detect for long periods of time and may impact the efficacy of our defenses and/or the products and services we provide. In addition, despite our best efforts, we may be unaware of or unable to anticipate these techniques or implement adequate

preventative measures. We have expended significant capital and other resources to protect against and remedy such potential security breaches, incidents and their consequences, including the establishment of a dedicated cybersecurity organization within our larger technology environment, and will continue to do so in the future.

We also face risks associated with security breaches and incidents affecting third parties with which we are affiliated or with which we otherwise conduct business. In particular, hardware, software or applications we develop or procure from third parties may contain, and have contained, defects in design or manufacture and/or may pose a security risk that could unexpectedly compromise information security, but none of which have been material to date. Consumers are generally concerned with the security and privacy of the internet, and any publicized security problems affecting our businesses and/or third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.[40]

[Emphasis in original.]

85.    PII and PCD have considerable value and constitute an enticing and well-known target to hackers. Hackers easily can sell such stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[41]

86.    "Personal Data is currency in the Information Age and is being traded to the tune of billions of dollars globally – and increasing each year as the more

---

[40] Live Nation Ent., Inc., Annual Report (Form 10-K) at 17-18 (Feb. 22, 2024).

[41] Brian Krebs, *The Value of a Hacked Company*, KREBS ON SEC. (July 14, 2016, 10:47 AM), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

personal data analyzed, categorized and linked."[42]  PII carries immense value to

not only companies and social media platforms, but also to cybercriminals who

seek to steal and use PII for a variety of reasons including blackmail, identity theft,

extortion, phishing attacks, distribution of malware, and sale to other

cybercriminals on the dark web.[43]

87.    The prevalence of data breaches and identity theft has increased

dramatically in recent years, accompanied by a parallel and growing economic

drain on individuals, businesses, and government entities in the United States.

According to the Identity Theft Resource Center ("ITRC"), in just the third quarter

of 2024, there were 672 reported data breaches in the United States, putting the

year on track to see nearly as many breaches as occurred in the record-high year of

2023.[44]  More than 241 million individuals' data reportedly were exposed in those

---

[42] *The Value of Personal and Private Data*, DIGITAL CONTROL ROOM,
https://www.digitalcontrolroom.com/the-value-of-personal-and-private-data/ (last
visited Jan. 8, 2025).

[43] How Much is Your Data Worth? The Complete Breakdown for 2021, INVISIBLY
(July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/;
Ravi Sen, Here's How Much Your Personal Information is Worth to
Cybercriminals – and What They Do With It, PBS NEWSHOUR (May 14, 2021),
https://www.pbs.org/newshour/science/heres-how-much-yourpersonal-
information-is-worth-to-cybercriminals-and-what-they-do-with-it.

[44] *Supply Chain Attacks Roar Back in Q3; Mega-Breaches Drive Increase in
Victims*, IDENTITY THEFT RES. CTR. (2024), https://www.idtheftcenter.org/wp-
content/uploads/2024/10/ITRC-Q3-2024-Data-Breach-Analysis-1.pdf.

breaches (again – just in the third quarter of 2024).[45]  The ITRC reported that

approximately 549 of the 672 data breaches in the quarter were the result of

cyberattacks.[46]

88.    Cloud storage databases are prime targets for cybercriminals.  It is

estimated that more than 60% of the world's corporate data is stored in the cloud,

making the cloud a highly attractive target for cybercriminals.[47]

89.    Indeed, "[i]n 2023, over 80% of data breaches involved data stored in

the cloud. That is not just because the cloud is an attractive target. In many cases, it

is also an easy target due to cloud misconfiguration – that is, companies

unintentionally misuse the cloud, such as allowing excessively permissive cloud

access, having unrestricted ports, and use unsecured backups."[48]

90.    According to the U.S. National Security Agency, "'cloud

misconfigurations are the most prevalent cloud vulnerability' and can be exploited

by hackers to access cloud data and services."[49]

---

[45] *Id*.

[46] *Id*.

[47] Stuart Madnick, *Why Data Breaches Spiked in 2023*, HARVARD BUS. REV. (Feb. 19, 2024), https://hbr.org/2024/02/why-data-breaches-spiked-in-2023.

[48] *Id*.

[49] *Id*.

91.    Cybercriminals can use stolen payment card information to create counterfeit payment cards and make unauthorized charges or withdrawals that can cause consumers to incur significant financial losses.  Indeed, the counterfeit payment cards (or the compromised payment card information itself) can be used to purchase high-ticket goods or gift cards that can then be sold for cash all while charging the consumer's original card.  Cybercriminals can also sell the stolen payment card information to other cybercriminals on the dark web.  In turn, when a payment card is fraudulently used, it can damage the cardholder's credit score, making it difficult to obtain new credit in the future.

92.    Following several high-profile data breaches in recent years, including those involving Target, Experian, Yahoo!, Home Depot, Wendy's, and Equifax, Defendants were on notice of the very real risk that hackers could exploit vulnerabilities in its data security.

93.    Defendants also knew or should have known the importance of safeguarding the PCD with which they were entrusted and of the foreseeable consequences if their data security systems were breached.  Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of PCD from occurring.

**F.    Defendants Failed to Comply with FTC Guidelines and Industry Standards of Care as to Data Security**

94.    Ticketmaster, as a merchant handling PCD, is subject to rigorous data security obligations established under both federal regulatory frameworks and industry standards.

95.    These include compliance with Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §45, which prohibits unfair or deceptive acts or practices in commerce, and adherence to the Payment Card Industry Data Security Standards (PCI DSS).

96.    Under Section 5 of the FTC Act, entities engaged in the collection, storage, or processing of sensitive consumer information are required to implement reasonable and appropriate security measures to safeguard that information from unauthorized access or theft.

97.    The Federal Trade Commission ("FTC") has consistently emphasized that companies must assess risks, mitigate vulnerabilities, and oversee TPSPs to ensure compliance with security standards.

98.    Failure to do so constitutes an unfair practice.  *See, e.g.*, *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240 (3d Cir. 2015).

99.    In addition, Ticketmaster is required to comply with PCI DSS, an industry-mandated standard governing the protection of PCD.

100.   PCI DSS establishes detailed requirements for encryption, access controls, logging, vulnerability management, and the oversight of TPSPs.

101.   Compliance with these standards is not optional for merchants processing payment card transactions and servers as the baseline for protecting cardholder data.

102.   Finally, Ticketmaster's obligations extend to its relationships with TPSPs, such as Snowflake, which may store, process, or transmit cardholder data on its behalf.

103.   PCI DSS requires merchants to validate and document the compliance of third-party providers, monitor their activities, and ensure that they implement robust security controls.

104.   These obligations reflect a shared responsibility model, whereby Ticketmaster remains accountable for ensuring that all entities involved in its payment card processing systems adhere to the required standards.

### G.    FTC Guidelines and Enforcement Precedents

105.   Defendants' obligations to safeguard PCD are informed by long-standing guidelines and enforcement actions under Section 5 of the FTC Act, 15 U.S.C. §45(a).

106.   Section 5 of the FTC Act prohibits unfair or deceptive acts or practices, including failing to implement reasonable data security measures.

107.   The FTC has repeatedly emphasized the importance of adequate safeguards to protect sensitive consumer information, including PCD, and has provided business with clear expectations for compliance.

108.   The FTC has issued extensive guidance detailing what constitutes "reasonable" data security measures.  These include: Encryption, Access Controls, Incident Response, and Third-Party Oversight.

109.   <u>Encryption</u>: Ensuring that sensitive data, such as payment card information, is encrypted both in transit and at rest.

110.   <u>Access Controls</u>: Limiting access to sensitive data on a "need-to-know" basis and implementing MFA to secure systems.

111.   <u>Incident Response</u>: Establishing protocols to promptly detect, contain, and respond to breaches.

112.   <u>Third-Party Oversight</u>: Contractually requiring service providers to adhere to reasonable data security standards and actively monitoring their compliance.

113.   Defendants' failure to comply with these well-established practices constitutes an unfair act or practice under the FTC Act.  Ticketmaster's alleged neglect in monitoring its third-party service provider, Snowflake, and its inadequate implementation of encryption and access controls exemplify its deviation from these guidelines.

114.    Further, the FTC's enforcement actions have consistently emphasized the legal obligations of businesses to implement and maintain reasonable data security measures.

115.    The FTC brought an action against Wyndham for failing to ensure that third-party entities operating under the Wyndham brand maintained adequate security measures, leading to a breach exposing payment card information of hundreds of thousands of consumers.  *See Wyndham Worldwide Corp.*, 799 F.3d 236.

116.    Similarly, Marriott was charged with failing to address vulnerabilities in systems inherited from its acquisition of Starwood Hotels, resulting in a breach compromising sensitive data of over 300 million consumers.  The FTC alleged that Marriott failed to apply adequate multifactor authentication to protect sensitive information, a duty akin to Ticketmaster's responsibility to oversee Snowflake's compliance with data security standards.  *See In the Matter of Marriott International, Inc.* , Docket No.C-4807 PII(Fed. Trade Comm.)   at 6.[50]

117.    These cases demonstrate that businesses are liable for failing to implement reasonable data security practices and for neglecting to monitor the

---

[50] *See* Compl., *In re Marriott Int'l, Inc.*, No. C-4807 (F.T.C.), available at www.ftc.gov/system/files/ftc_gov/pdf/1923022marriottcomplaint_0.pdf.

compliance of TPSPs.  The FTC's enforcement history establishes a clear

precedent for holding Ticketmaster accountable under Section 5 of the FTC Act.

118.   The FTC's guidelines and enforcement actions illustrate the

fundamental data security obligations Ticketmaster failed to meet.  Despite its

reliance on Snowflake as a third-party processor, Ticketmaster retained ultimate

responsibility for ensuring compliance with data security standards.  Its failure to

implement adequate safeguards – including encryption, access controls, and

monitoring of Snowflake's practices – constitutes an unfair practice under Section

5 of the FTC Act.  Ticketmaster's actions not only violated industry standards, but

also exposed millions of consumers to significant harm, including financial losses

and identity theft.

119.   Ticketmaster's duty to ensure third-party compliance extends beyond

contractual obligations.  Under the FTC Act, Ticketmaster was required to employ

reasonable measures to secure consumer data, which includes actively monitoring

third-party processors and ensuring adherence to recognized industry standards.

*See* 15 U.S.C. §45(a); *Wyndham Worldwide Corp.*, 799 F.3d at 240.  Failure to

fulfill these responsibilities constitutes an unfair practice under the FTC Act.

120.   Despite these obligations, Ticketmaster's oversight of Snowflake was

insufficient to ensure compliance with PCI DSS standards or reasonable security

practices.  This failure contributed to the unauthorized access and exposure of

millions of customers' PCD.  Snowflake's involvement as a third-party processor heightened Ticketmaster's obligations to: (1) conduct thorough risk assessments of Snowflake's systems to identify vulnerabilities; (2) monitor Snowflake's compliance with PCI DSS standards through regular audits and evaluations; and (3) address any deficiencies in Snowflake's data security practices promptly.

121.   Ticketmaster's inability to enforce these requirements reflects a systemic failure to implement adequate third-party oversight.  By neglecting its responsibilities under PCI DSS and the FTC Act, Ticketmaster permitted significant vulnerabilities within Snowflake's systems to remain unaddressed, ultimately leading to the Data Breach.

122.   Defendants failed to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII and Plaintiffs' and the Class' PCD, resulting in significant harm to millions of consumers.  These failures constitute an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.

123.   Defendants failed to implement fundamental data security measures, including encryption, access restrictions, and breach detection protocols.  These deficiencies enabled attackers to gain unauthorized access to millions of customers' sensitive information, compromising their privacy and financial security.

124.   Defendants' failure to employ reasonable and appropriate measures to protect customers' PII and Plaintiffs' and the Class' PCD constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.  The FTC has consistently required organizations to implement adequate data security practices to prevent harm to consumers, as demonstrated in prior enforcement actions, including the Wyndham and Marriott cases.

125.   Defendants were fully aware of their obligation to safeguard customers' PII and Plaintiffs' and the Class' PCD.  This awareness stems from industry standards, contractual requirements with third-party vendors, and prior data breaches that highlighted the necessity of robust security measures.  Despite this knowledge, Defendants failed to implement appropriate safeguards, prioritizing expediency over security.

126.   The Data Breach inflicted significant harm on victims, including financial losses, identity theft, and emotional distress.  Plaintiffs' whose PCD was exposed face ongoing risks of fraud and misuse of that personal.  Defendants' negligence has imposed a lasting burden on Plaintiffs', who must now take additional steps to protect themselves and their customers from further harm.

## H.   Ticketmaster Represents that Its Consumer Data Is Adequately Safeguarded

127.   In addition to their statutory duties, Defendants expressly recognize their duty to safeguard customer PCD and PII, stating:

*Class Action Complaint and Demand for Jury Trial*                                    **Page 43**

- "We have security measures in place to protect your information."[51]

- "We're always taking steps to make sure your information is protected and deleted securely when we no longer need it."[52]

- "We take steps to try to make sure your information is protected and to delete it securely when we no longer need it."[53]

- "We have a global privacy team of trust and security professionals that ensure end-to-end protection of your personal information throughout the data lifecycle."[54]

128.    In its 2023 Form 10-K, filed with the SEC on February 22, 2024, Ticketmaster acknowledges that cybersecurity is a "critical element" of its risk management program.[55]  Ticketmaster touts its technical safeguards, incident response and recovery planning, education and awareness, and, importantly, its third-party risk management.[56]

129.    As to third-party risk management, Ticketmaster asserts:

---

[51] LIVE NATION ENT., s*upra* note 2.

[52] *Privacy Policy*, TICKETMASTER (Dec. 19, 2024), https://privacy.ticketmaster.com/privacy-policy.

[53] LIVE NATION ENT., s*upra* note 55.

[54] Ticketmaster, s*upra* note 56.

[55] Form 10-K, s*upra* note 45.

[56] *Id*.

> We maintain a comprehensive, risk-based approach to identifying and overseeing material cybersecurity threats presented by third parties, including vendors, service providers, and other external users of our systems, as well as the systems of third parties that could adversely impact our business in the event of a material cybersecurity incident affecting those third-party systems, including any outside auditors or consultants who advise on our cybersecurity systems.[57]

130.    As to its regulatory obligations, Ticketmaster acknowledged that it is "subject to federal, state and local laws, both domestically and internationally, governing matters such as: privacy and the protection of personal or sensitive information[.]"[58]  In particular, Ticketmaster acknowledges that:

> We are required to comply with federal, state and international laws regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and user data, an area that is increasingly subject to legislation and regulations in numerous jurisdictions around the world, including the European Union's GDPR (as defined and discussed below in Item 1A.—Risk Factors) and the California Consumer Protection Act.[59]

131.    Ticketmaster claimed that it devoted "significant capital and other resources to protect against and remedy such potential security breaches, incidents and their consequences, including the establishment of a dedicated cybersecurity

---

[57] *Id.*

[58] *Id.* at 9.

[59] *Id.*

organization within our larger technology environment, and will continue to do so in the future."[60]

132.   In light of the foregoing statements (among others), Ticketmaster intended Plaintiffs and the Class to rely on Ticketmaster to adequately safeguard customer data.  Plaintiffs reasonably expected that such information would be stored by Ticketmaster in a safe and confidential manner, using all reasonable safeguards and protections.  The potential harm from doing otherwise was obvious to Ticketmaster, which knew that Plaintiffs, as payment card issuers, lenders, and deposit account holders, would bear the ultimate responsibility for identity theft and fraudulent lending and other consumer transactions.

133.   Much like a bailment of personal property, the receipt by Ticketmaster of uniquely-identifying PII and PCD – for Ticketmaster's own business purposes – places Ticketmaster in a special relationship with Plaintiffs and the Class, which rely on Ticketmaster to maintain the security (and hence, the uniquely-identifying nature) of such information.  The resulting harm to Plaintiffs and the Class from mishandling the security and confidentiality of this information was, at all times, foreseeable to Ticketmaster.

---

[60] *Id.* at 17.

I.      **Plaintiffs and Class Members Have Been, and Will Continue to Be, Harmed by the Ticketmaster Data Breach**

134.    The Data Breach caused substantial damage to Plaintiffs and Class members, who had to act immediately to mitigate the massive fraudulent transactions being made on payment cards that they had issued to their customers, while simultaneously taking steps to prevent future fraud.  Consumers are ultimately protected from most fraud loss, but Plaintiffs and Class members are not.  Financial institutions bear primary responsibility for reimbursing customers for fraudulent charges on the payment cards they issue and pay for the costs of reissuing payment cards that had to be cancelled and reissued as a result of a data breach.

135.    As a result of the Data Breach, Plaintiffs and Class members have been forced to cancel and reissue payment cards, change or close accounts, notify customers that their cards were compromised, investigate claims of fraudulent activity, refund fraudulent charges, increase fraud monitoring on potentially impacted accounts, and take other steps to protect themselves and their customers. They also lost interest and transaction fees due to reduced card usage. Furthermore, debit and credit cards belonging to Class members and Plaintiffs, as well as the account numbers on the face of the cards, were devalued.

136.   The financial damages suffered by Plaintiffs and Class members are massive and continue to increase.  Industry sources estimate that millions of accounts could be affected by the Data Breach.

**J.    Plaintiffs' Experience**

137.   Beginning on or around December 17, 2024, Visa issued a number of Compromised Account Management System ("CAMS") alerts to Plaintiff FHCU, indicating that the estimated fraud "exposure window" for the Ticketmaster Data Breach ran from May 18, 2009, through May 18, 2019.  The CAMS alerts further linked to a Ticketmaster press release and indicated that the breach compromised certain PCD, including PAN data, which is a unique payment card number (credit, debit, or prepaid cards, etc.) that identifies the issuer (financial institution) and the cardholder account.  The PAN number is crucial for the identification of the issuer and the specific account within the issuer's systems.  PANs are used across various card types including credit, debit, and prepaid cards, and are essential for facilitating electronic financial transactions.

138.   By December 19, 2024, Plaintiff FHCU had received 30 CAMS alerts for the Ticketmaster Data Breach, with each alert containing an average of 38 impacted cards or more.

139.   Beginning on or around December 17, 2024, Visa issued a number of Compromised Account Management System ("CAMS") alerts to Plaintiff CCU,

indicating that the estimated fraud "exposure window" for the Ticketmaster Data Breach ran from May 18, 2009, through May 18, 2019.  The CAMS alerts linked to a Ticketmaster press release and further indicated that the breach compromised certain PCD, including PAN data, which is a unique payment card number (credit, debit, or prepaid cards, etc.) that identifies the issuer (financial institution) and the cardholder account.  The PAN number is crucial for the identification of the issuer and the specific account within the issuer's systems.  PANs are used across various card types including credit, debit, and prepaid cards, and are essential for facilitating electronic financial transactions.

140.   By December 19, 2024, Plaintiff CCU had received 39 CAMS alerts for the Ticketmaster Data Breach, with identified on an average of a dozen impacted cards or more per alert.

## V.    CLASS ACTION ALLEGATIONS

141.   Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of the following nationwide class ("Nationwide Class" or the "Class"):

### A.    Nationwide Class

All Financial Institutions in the United States (including its Territories and the District of Columbia) whose consumers' PII and/or PCD was exposed as a result of the Ticketmaster Data Breach announced on or about May 2024.

142.    Excluded from the Nationwide Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Nationwide Class are any judicial officer(s) presiding over this matter, members of their immediate family, and members of their judicial staff.

143.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to moving for class certification.

### 1.    Rule 23(a)

144.    This action may properly be maintained as a class action and satisfies the requirements of Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy.

145.    **Numerosity.**  The members of the Class are so numerous and geographically dispersed that joinder would be impracticable.  The number of Class members exceeds 100.

146.    **Commonality and Predominance.**  There are common questions of law and fact that predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

a.    whether Defendants owed a duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and members of

the Class when obtaining, storing, using, and managing PII and PCD, including taking action to safeguard such data;

b.      whether Defendants actively mishandled PII and PCD and implemented and maintained data security measures that it knew or should have known were unreasonable and inadequate to protect PII and PCD;

c.      whether Defendants negligently allowed PII and PCD to be accessed, used, or disclosed by third parties;

d.      whether Plaintiffs and members of the Class justifiably relied on representations made by Ticketmaster as to its data security practices and the integrity and accuracy of PCD Ticketmaster provided;

e.      whether Plaintiffs and members of the Class justifiably relied on representations made by Ticketmaster that it would oversee and protect PCD and given to third parties like Snowflake and ensure that such entities maintained adequate data security practices and the integrity and accuracy of the PCD Ticketmaster provided;

f.      whether Ticketmaster intended that Plaintiffs and members of the Class would rely on Ticketmaster's representations as to its

data security practices and the integrity and accuracy of
information Ticketmaster provided;

g.    whether Ticketmaster failed to adequately notify Plaintiffs and
members of the Class that its data systems were breached;

h.    whether Plaintiffs and members of the Class were injured and
suffered damages and ascertainable losses;

i.    whether Defendants' actions and inactions that failed to provide
reasonable security proximately caused the injuries suffered by
Plaintiffs and members of the Class;

j.    whether Plaintiffs and members of the Class are entitled to
damages and, if so, the measure of such damages; and

k.    whether Plaintiffs and members of the Class are entitled to
injunctive, equitable, declaratory, and/or other relief, and, if so,
the nature of such relief.

147.    **Typicality.**  Plaintiffs' claims are typical of the claims of the absent
Class members and have a common origin and basis.  Plaintiffs and absent Class
members are all financial institutions injured by the Data Breach.  Plaintiffs'
claims arise from the same practices and course of conduct giving rise to the
claims of the absent Class members and are based on the same legal theories,
namely, the Data Breach.  If prosecuted individually, the claims of each Class

member would necessarily rely upon the same material facts and legal theories and seek the same relief.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

148.  **Adequacy.**  Plaintiffs will fully and adequately assert and protect the interests of the absent Class members and have retained Class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiffs nor their attorneys have any interests contrary to, or conflicting with, the interests of absent Class members.

## 2.    Rule 23(b)(3)

149.  **Predominance.**  As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' case will also resolve them for the Class' claims.

150.  **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable.  Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues.  Class

treatment will also permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so.  Plaintiffs know of no difficulties in managing this action that would preclude its maintenance as a class action.

### 3.    Rule 23(b)(2)

151.    All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied.  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.  Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests.  Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

152.    Contact information for each Class member, including mailing addresses, is readily available, facilitating notice of the pendency of this action.

# VI.   LEGAL CLAIMS

## COUNT I

### NEGLIGENCE
**(On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)**

153.   Plaintiffs repeat and reallege all preceding allegations as though fully set forth herein.

154.   Defendants owe a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and members of the Class when obtaining, storing, using, selling, and managing PII and PCD, including taking action to reasonably safeguard such data and providing notification to Plaintiffs and the Class of any breach in a timely manner so that appropriate action can be taken to minimize or avoid losses.  This duty arises from several sources (described below) and is independent of any duty as a result of any contractual obligations.

155.   Defendants have a common law duty to prevent the foreseeable risk of harm to others, including the Plaintiffs and the Class.  It was certainly foreseeable to Defendants that injury would result from a failure to use reasonable measures to protect PCD and to provide timely notice that a breach was detected.  It was also foreseeable that, if reasonable security measures were not taken, hackers would steal PCD belonging to millions of Ticketmaster customers; thieves would use PCD to make large numbers of fraudulent transactions; financial institutions would

be required to mitigate the fraud by cancelling and reissuing the compromised cards and reimbursing their customers for fraud losses; and that the resulting financial losses would be immense.

156.    Ticketmaster assumed the duty to use reasonable security measures as a result of its conduct to accept payment cards as a method of payment and to oversee the conduct of its vendors such as Snowflake who was entrusted with PCD.

157.    In addition to their general duty to exercise reasonable care, Defendants also had a duty of care as a result of the special relationship that existed between themselves and the Plaintiffs and members of the Class.  The special relationship arose because financial institutions entrusted Defendants with PCD.  Only Defendants had the ability to ensure that Ticketmaster's Snowflake account and the systems of Snowflake were sufficient to protect against the harm to financial institutions from the Data Breach.

158.    Defendants' duty to use reasonable data security measures also arose under §5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PCD by businesses such as Ticketmaster.  The FTC publications and data security breach orders described above further form the basis of Defendants' duty.  In addition, individual states

have enacted statutes based upon the FTC Act that also create a duty on the part of Defendants. Defendants' lax and deficient data security measures, and failure to promptly notify Plaintiffs and the Class of the Data Breach constitute unfair practices in violation of the FTC Act.

159. Defendants' duty to use reasonable care in protecting PCD arose not only as a result of the common law and the statutes described above, but also because they were bound by, and had committed to comply with, industry standards, specifically including duties under PCI DSS.

160. Defendants breached their common law, statutory, and other duties and thus, was negligent by failing to use reasonable measures to protect the Plaintiffs' and Class members' PCD from the hackers who perpetrated the Data Breach and by failing to provide timely notice of the breach. Upon information and belief, the specific negligent acts and omissions committed by Defendants include, but are not limited to, some, or all, of the following:

    a.    failure to protect, store and delete PCD after the time period necessary to authorize the transaction;

    b.    failure to implement systems to protect against malware;

    c.    failure to comply with industry standards for two-factor authentication and security of PCD;

    d.    failure to maintain adequate firewalls;

e.    failure to track and monitor access to its network and PCD;

f.    failure to limit access to PCD to those with a valid purpose;

g.    failure to encrypt PCD;

h.    failure to adequately staff and fund its data security operations;

i.    failure to use due care in hiring, promoting, and supervising those responsible for its data security operations;

j.    failure to recognize red flags signaling that Defendants' systems were inadequate and that, as a result, the potential for a massive data breach was increasingly likely;

k.    failure to recognize that cybercriminals had infiltrated systems containing PCD and were stealing PCD while the Data Breach was taking place; and

l.    failure to disclose the Data Breach in a timely manner.

161.   In connection with the conduct described above, Defendants acted wantonly, recklessly, and with complete disregard for the consequences.

162.   As a direct and proximate result of Defendants' negligence, Plaintiffs and members of the Class have suffered, and continue to suffer, injury, including, but not limited to, cancelling and reissuing payment cards, changing or closing accounts, notifying customers that their cards were compromised, investigating claims of fraudulent activity, refunding fraudulent charges, increasing fraud

monitoring on potentially impacted accounts, and taking other steps to protect themselves and their customers.  Plaintiffs and the Class also lost interest and transaction fees, due to reduced card usage resulting from the breach, and the cards they issued (and the corresponding account numbers) were rendered worthless.

## COUNT II

### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)

163.    Plaintiffs repeat and reallege all preceding allegations as though fully set forth herein.

164.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Ticketmaster, of failing to use reasonable measures to protect PCD.  The FTC publications and orders described above also form part of the basis of Defendants' duty.

165.    Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiffs' and the Class' PCD and not complying with applicable industry standards, including PCI DSS, as described in detail herein.  Defendants' conduct was particularly unreasonable given the nature and amount of PCD it obtained (from 2009 through 2019) and stored in Ticketmaster's Snowflake account, and the foreseeable consequences of a

data breach, including, specifically, the immense damages that would result to consumers, Plaintiffs and the Class.

166.   Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

167.   Plaintiffs and members of the Class are within the class of persons that §5 of the FTC Act (and similar state statutes) was intended to protect, as they are engaged in trade and commerce and bear primary responsibility for directly reimbursing consumers for fraud losses.  Moreover, many of the Class members are credit unions, which are organized as cooperatives whose members are consumers.

168.   The harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against.  Indeed, the FTC has pursued over 50 enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by the Plaintiffs and the Class.

169.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injury, including, but not limited to, cancelling and reissuing payment cards, changing or closing accounts, notifying customers that their cards were compromised, investigating claims of fraudulent activity, refunding fraudulent charges, increasing fraud

monitoring on potentially impacted accounts, and taking other steps to protect

themselves and their customers.  They also lost interest and transaction fees, due to

reduced card usage resulting from the breach, and the cards they issued (and the

corresponding account numbers) were rendered worthless.

## COUNT III

**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)**

170.   Plaintiffs repeat and reallege all preceding allegations as though fully

set forth herein.

171.   Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq.*, this

Court is authorized to enter a judgment declaring the rights and legal relations of

the parties and grant further necessary relief.  Furthermore, the Court has broad

authority to restrain acts, such as here, which are tortious and which violate the

terms of the federal and state statutes described herein.

172.   An actual controversy has arisen in the wake of the Data Breach

regarding its common law and other duties to reasonably safeguard PCD.

Plaintiffs allege that Defendants' data security measures were inadequate and

remain inadequate.  Plaintiffs anticipate that Defendants will deny these

allegations.  Furthermore, Plaintiffs and the Class members continue to suffer

injury as additional payment cards are identified and need to be reissued and

additional fraudulent charges are being made on payment cards they issued to Ticketmaster customers.

173.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

        a.      Defendants continue to owe a legal duty to secure Ticketmaster's customers' personal and financial information – specifically including PCD used by Ticketmaster customers – and to notify financial institutions of a data breach under the common law, §5 of the FTC Act, PCI DSS standards, its commitments, and various state statutes;

        b.      Defendants continue to breach this legal duty by failing to employ reasonable measures to secure its customers' PII and PCD; and

        c.      Defendants' ongoing breaches of its legal duty continue to cause Plaintiffs and the Class harm.

174.   The Court also should issue corresponding injunctive relief requiring Defendants to employ adequate security protocols, consistent with industry standards, to protect PCD.  Specifically, this injunction should, among other things, direct Defendants to:

a.    utilize industry standard encryption to require two-factor authentication for Defendants' computer systems and/or accounts;

b.    require that PCD be encrypted at all other times;

c.    require that Defendants only maintain PCD for a limited time where it has an ongoing need to use such data;

d.    require Defendants to delete all historical PCD that they possess;

e.    engage third-party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

f.    audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

g.    regularly test its systems for security vulnerabilities, consistent with industry standards;

h.    comply with all PCI DSS standards pertaining to the security of its customers' personal and confidential information; and

i.    install all upgrades recommended by manufacturers of security software and firewalls used by Defendants.

175.   If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Ticketmaster and Snowflake.  The risk of another such breach is real, immediate, and substantial.  If another breach at Ticketmaster and Snowflake occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.  Simply put, monetary damages, while warranted to compensate Plaintiffs and the Class for out-of-pocket damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Class, which include monetary damages that are not legally quantifiable or provable and reputational damage.

176.   The hardship to Plaintiffs and the Class, if an injunction is not issued, exceeds the hardship to Defendants, if an injunction is issued.  Among other things, if another massive data breach occurs at Ticketmaster and Snowflake, Plaintiffs and members of the Class will likely incur hundreds of millions of dollars in damage.  On the other hand, the cost to Defendants of complying with an injunction by employing reasonable data security measures is relatively minimal and Defendants have a pre-existing legal obligation to employ such measures.

177.   Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by

preventing another data breach at Ticketmaster and Snowflake, thus eliminating the injuries that would result to Plaintiffs, the Class, and the millions of consumers whose confidential information would be compromised.

## COUNT IV

### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)

178.  Plaintiffs restate and reallege all preceding allegations as though fully set forth herein.

179.  Plaintiffs and Class members conferred a monetary benefit on Defendants by providing them with their valuable PCD.

180.  Defendants knew that Plaintiffs and Class members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PCD entrusted to them.

181.  Defendants profited from Plaintiffs' and Class members' PCD and use of Plaintiffs' and Class members' PCD for business purposes.

182.  Defendants failed to secure Plaintiffs' and Class members' PCD and, therefore, did not fully compensate Plaintiffs or Class members for the value that their PCD provided.

183.  Defendants acquired Plaintiffs' and the Class' PCD through inequitable record retention as Defendants failed to disclose the inadequate data security practices previously alleged.

184.   If Plaintiffs and Class members had known Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PCD, they would not have agreed to the entrustment of their PCD to Defendants

185.   Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class members conferred upon Defendants.

186.   Plaintiffs and Class members are without an adequate remedy at law

187.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered injuries, including those identified above.

188.   Plaintiffs and Class members are entitled to restitution and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct, as well as return of their sensitive PCD and/or confirmation that it is secure.  This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class members may seek restitution or compensation.

## COUNT V

**Violation of the California Unfair Competition Law**
**California Business & Professions Code §17200,** *et seq.*
**(On Behalf of Plaintiff and the Nationwide Class Against the Ticketmaster**
**Defendants)**

189.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

190.   Plaintiffs and Ticketmaster are "persons" within the meaning of California Business and Professions Code §17201.

191.   California's Unfair Competition Law prohibits any unlawful, unfair, or fraudulent business act or practice, as well as any false or misleading advertising.

192.   Ticketmaster engaged in unlawful, unfair, and fraudulent business practices within the meaning of California Business and Professions Code §17200.

193.   Ticketmaster's unlawful business practices include, *inter alia*:

    a.    Failing to comply with California's data protection laws, including the California Consumer Privacy Act (CCPA);

    b.    Violating industry standards, such as the Payment Card Industry Data Security Standards (PCI DSS), which require robust encryption, access controls, and monitoring cardholder data environments; and

     c.    Failing to properly secure PCD and Personal Identifiable Information (PII) entrusted to them by consumers and financial institutions.

194.  Ticketmaster's unfair business practices include, but are not limited to:

     a.    Failing to adopt adequate security measures, despite being aware of the risks associated with unauthorized access to PCD;

     b.    Placing their own profit over the security of customer data by delaying necessary upgrades to their cybersecurity systems; and

     c.    Causing substantial harm to Plaintiffs and the Class, who have incurred significant costs to address the fallout of the Data Breach, including the cancellation and reissuance of cards, investigation of fraudulent charges, and loss of customer trust.

195.  Ticketmaster's fraudulent business practices include, but are not limited to:

     a.    Representing to the public and Plaintiffs that their data systems were secure, when they know or should have known this was false;

b.      Falsely representing compliance with PCI DSS standards to payment card networks and financial institutions, despite systemic deficiencies; and

c.      Concealing the full extent of their non-compliance and security vulnerabilities both before and after the Data Breach.

196.    As a direct and proximate result of Ticketmaster's unlawful, unfair, and fraudulent business practices, Plaintiffs and the Class have suffered injury in fact and lost money or property, including costs associated with replacing compromised payment cards, investigating fraudulent activity, and mitigating the risks of further harm.

197.    Defendants' conduct affects the public interest, as it has impacted not only Plaintiffs and the Class but also millions of customers whose data was exposed.

198.    Pursuant to California Business and Professions Code §17203, Plaintiffs seek an order:

a.      Enjoining Ticketmaster from engaging in further unlawful, unfair, and fraudulent practices;

b.      Requiring Ticketmaster to implement and maintain reasonable data security measures to protect PCD and PII;

    c.    Restoring any money or property acquired by Ticketmaster through their unfair practices; and

    d.    Awarding attorneys' fees, costs, and any other relief deemed just and proper.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, respectfully request that the Court:

A.    Certify the Class and appoint Plaintiffs and Plaintiffs' counsel to represent the Class;

B.    Enter a monetary judgment in favor of Plaintiffs and the Class to compensate them for the injuries they have suffered and will continue to suffer, together with pre-judgment and post-judgment interest and treble damages and penalties where appropriate;

C.    Enter a declaratory judgment as described herein and corresponding injunctive relief requiring Defendants to employ adequate data security protocols consistent with industry standards to protect PII and PCD;

D.    Grant the injunctive relief requested herein;

E.    Award Plaintiffs and the Class reasonable attorneys' fees and costs of suit, as allowed by law; and

F.    Award such other and further relief as this Court may deem just and

proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

DATED: January 15, 2025

Respectfully submitted,


*/s/ Domenic A. Cossi*
Domenic A. Cossi
**WESTERN JUSTICE ASSOCIATES, PLLC**
Trial Lawyers for People and the Environment
303 W. Mendenhall, Suite 1
Bozeman, Montana 59715
Telephone: (406) 587-1900
Facsimile: (406) 587-1901
Email: dominic@westernjusticelaw.com

Joseph P. Guglielmo (*Pro Hac Vice Forthcoming*)
Erin G. Comite (*Pro Hac Vice Forthcoming*)
Andrew Stanko (*Pro Hac Vice Forthcoming*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, New York 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
Email: jguglielmo@scott-scott.com
Email: ecomite@scott-scott.com
Email: astanko@scott-scott.com

*Attorneys for Plaintiffs Financial Horizons Credit*
*Union and Collegedale Credit Union*